Case No. 04 CV-721 C (C)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

RAY HULL and KAREN K. HULL,

Plaintiffs,

v.

BARAN TELECOM, INC., WIRELESS SOLUTIONS, LLC.,
and NEXTEL PARTNERS OPERATING CORP.,

Defendants.

## PLAINTIFF'S TRIAL BRIEF

Thomas J. McGeady, O.B.A. #5984
Ryan P. Langston, O.B.A. #20517
LOGAN & LOWRY, LLP
101 South Wilson Street
P. O. Box 558
Vinita, OK 74301
Phone: (918) 256-7511
Fax: (918) 256-3187

Attorneys for Ray Hull and Karen K. Hull

January 6, 2006

# TABLE OF CONTENTS

I.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  Statement of Material Facts as to
     Which There is a Substantial Controversy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III. Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     A.   Nebraska Law, Not Oklahoma Law,
          Is The Substantive Law Applicable To The Instant Action . . . . . . . . . . . . . . . . 5

     B.   Under Nebraska Law, Baran Had A Duty To
          Provide Ray Hull With A Safe Workplace . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          (a)   The *Parrish* Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                (1)   Baran Supervised the Work that Caused the Injury . . . . . . . . . . . 11

                (2)   Baran Had Actual Knowledge of the Danger That
                      Caused the Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                (3)   Baran Had the Opportunity to Prevent the Injury
                      and Failed to Do So . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

          (b)   The Accident Occurred During The
                Course of Performance Of The Contract
                Between The Subcontractor And The Contractor . . . . . . . . . . . . . . . . . . 13

     C.   Baran Owed Ray Hull A Duty Of
          Care As A Supplier Of A Chattel In
          Connection With Its Gin Pole And Hoist . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

V.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15


## TABLE OF AUTHORITIES

*Mauldin v. WorldCom, Inc.,* 263 F.3d 1205 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Brickner v. Gooden,* 525 P.2d 632 (Okla. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7, 8

*Anderson v. Nashua Corp.*, 519 N.W.2d 275 (Neb. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Parrish v. Omaha Public Power District,* 496 N.W.2d 902 (Neb. 1993) . . . . . . . . . . 9, 10, 11, 13

*Whalen v. U.S. West Communications, Inc.*, 570 N.W.2d 531 (Neb. 1997) . . . . . . . . . . . . . . . . 10

*Dellinger v. Omaha Public Power District,* 611 N.W.2d 132 (Neb. 2000) . . . . . . . . . . . . . . . . . 10

*Sullivan v. Geo. A. Hormel and Co.*, 303 N.W.2d 476 (Neb. 1981) . . . . . . . . . . . . . . . . . . . 10, 13

*Thorne v. Omaha Public Power District*, 1997 WL 249434 (Neb. App. 1997) . . . . . . . . . . . . . 11

*McKinstry v. County of Cass*, 424 N.W.2d 422 (Neb. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Hand v. Rorick Construction Co.*, 206 N.W.2d 835 (Neb. 1971) . . . . . . . . . . . . . . . . . . . . . . . . 13

*Semlar v. Sears, Roebuck & Co.*, 689 N.W.2d 327, 334 (Neb. 2004) . . . . . . . . . . . . . . . . . . . . . 13

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| RAY HULL and KAREN K. HULL, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 04 CV-721 C (C) |
| ) | |
| BARAN TELECOM, INC., ) | |
| WIRELESS SOLUTIONS, LLC., and ) | |
| NEXTEL PARTNERS OPERATING CORP., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**PLAINTIFF'S TRIAL BRIEF**

COME NOW, the Plaintiffs, Ray Hull and Karen K. Hull, husband and wife, and for their Trial Brief herein respectfully show the Court as follows:

**I.**

**Introduction**

Steve Bethel, an employee of Baran Telecom, Inc., contacted Plaintiff Ray Hull on November 19, 2003, to inquire whether Mr. Hull's employer, Innovative Wireless Construction, Inc. ("IWC"), was interested in immediately taking over a stalled project, *i.e.*, building a 350-foot self-supporting cell phone tower in Nebraska. Mr. Hull expressed interest and, quickly received a call from Mr. Dee Farquhar, a Project Supervisor at Baran Telecom, Inc., who asked Mr. Hull to immediately assemble a crew to begin work near Fremont, Nebraska, stating that a crane was on-site to stack the tower, and that the defaulting tower company, Skyline Tower, would remain on site to

Page 1

assist. Finally, he told Mr. Hull that Baran's customer, Nextel, required the job be finished by midnight on November 27, 2003, Thanksgiving Day.

Mr. Hull took the job on behalf of IWC, and began driving to Nebraska at 1:30 a.m. on November 20th with a crew and tools. After a 13-hour drive, he arrived at the tower site to find the job in complete disarray. Mr. Hull and his crew, with minimal assistance from a few Skyline laborers, worked until dark assembling tower sections and worked from dawn till dark both the next days, Friday and Saturday, November 21st and 22nd. Using the large crane, they stacked the tower to a height of 240 feet by nightfall on Saturday, November 22, 2003.

Throughout this period, Mr. Hull communicated with Baran's Project Supervisor, Dee Farquhar, and with Mr. Scott Rogers, an employee of another subcontractor on the project, Southeast Wireless Communications, whom Mr. Farquhar had expressly designated as his on-site liaison. By nightfall on Saturday, November 22nd, Mr. Hull reported, through Mr. Rogers, that he and his crew were well ahead of schedule and needed only two (2) more lifts or "picks" with the crane to have the tower completely stacked. On the morning of Sunday, November 23rd, however, he found that the crane operator, who had expressed concern the previous day over high winds, was dismantling the crane and leaving the job site. The operator refused to wait for more favorable conditions, citing the press of contractual commitments elsewhere.

Learning from Mr. Rogers that there were no other crane companies in the area with a crane big enough to finish the tower, Mr. Hull called Mr. Farquhar to discuss options. Mr. Farquhar, by this time, was extremely upset, to the point, that, in Mr. Hull's words, "(he) thought he was going to . . . start hatching chickens..." Mr. Hull told him that the only option was to finish stacking the tower with a gin pole, a sort of miniature crane that the erection crew, using a powerful winch or

"hoist," raises to the top of the semi-constructed tower to lift disassembled pieces of tower sections which the crew bolts to the apex of the partially completed tower. Mr. Farquhar told Mr. Hull that he didn't care how he did it, but he was to complete the tower by midnight, November 27.

Mr. Hull immediately called his supervisor at IWC, who told him that IWC's gin pole and hoist were stored in Fredericksburg, Texas, at the warehouse of another tower company. Mr. Hull relayed this information to Mr. Farquhar whose reply was: "When are you leaving?" Mr. Hull responded that he'd leave as soon as he could brief his crew on work to be done while he was gone.

Mr. Hull and an employee, Frankie Ketchens, left the job site just after noon Sunday, November 23rd and drove straight through to Durant, Oklahoma, where they retrieved Mr. Hull's trailer to transport the gin pole and hoist. After a little over an hour's sleep, they left Mr. Hull's residence at approximately 5:30 a.m., and headed for Fredericksburg.

Arriving in Fredericksburg at approximately 10:00 a.m., Mr. Hull couldn't get access to the warehouse to retrieve IWC's gin pole and hoist, and, after a number of calls, learned that the owners of the warehouse were working in another state. He contacted Mr. Farquhar at approximately noon of that day, and asked about using one of Baran's gin poles and hoists. Mr. Farquhar told him to come immediately to Baran's yard in Houston, Texas, and Mr. Hull immediately proceeded to Baran's yard where he and Mr. Ketchens loaded a gin pole, hoist, and rigging equipment onto Mr. Hull's trailer. As they finished loading, Mr. Farquhar loudly reiterated that the project had to be completed by midnight on November 27th. Mr. Hull replied that he understood the deadline, and that he'd do his utmost.

Mr. Hull and Mr. Ketchens immediately started back to Nebraska, driving from Houston to Fremont, without stopping to sleep. Mr. Farquhar called them several times during the trip to ask

Page 3

how close they were to Fremont. The pair arrived at the job site between 10:15 and 10:30 the next morning and the entire crew immediately began preparing to use the gin pole and hoist, successfully rigging the gin pole in the top of the tower by about 2:15 in the afternoon.

By this time Mr. Hull knew that he and Mr. Ketchens were both exhausted, but felt keenly pressured to continue working due to Mr. Farquhar's continuous, emphatic demands for project completion by midnight, November 27th. Additionally, at least one Nextel representative was on site observing progress and reporting to his superiors on a cell phone throughout the morning and afternoon.

Mr. Hull and crew proceeded with a practice hoist to ensure that the gin pole and hoist were safely rigged and operating properly. Following the practice run, they began to lift the first leg (a component of a disassembled tower section).

Mr. Hull led the crew on the top of the tower and Mr. Ketchens ran the hoist on the ground. They successfully raised the leg section to the top of the tower, and were in the process of maneuvering it into position to attach it to the top of the tower, when Mr. Hull signaled to Mr. Ketchens to raise the section very slightly. At this point, the gin pole rigging broke and it fell 240 feet to the ground with Mr. Hull attached to it. Mr. Hull's safety harness tore on impact and he free fell the remaining 40 feet to the ground. Amazingly, he survived the fall.

## II.

### Argument And Authorities

#### A.

#### Nebraska Law, Not Oklahoma Law, Is The Substantive Law Applicable To The Instant Action

"A federal trial court sitting in diversity jurisdiction must apply the choice of law rules of the forum state . . . ." *Mauldin v. WorldCom, Inc.,* 263 F.3d 1205 (10th Cir. 2001) at 1211; *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under Oklahoma law, as a general principle the rights and liabilities of parties with respect to a particular issue in tort are to be determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties. *Brickner v. Gooden,* 525 P.2d 632, 637 (Okla. 1974). The factors that are to be taken into account in determining which state has the most significant relationship to the occurrence and the parties include: (1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (4) the place where the relationship, if any, between the parties, occurred. *Id.* These factors are to be evaluated according to their relative importance with respect to the particular issue. *Id.* These factors are derived from those laid out in the Restatement (Second) Conflicts of Law, § 145 (1971).

The threshold issue is whether Baran owed Hull a duty of care. In order for actionable negligence to exist, there must be a legal duty on the part of the Defendant to protect the Plaintiff from injury, failure to discharge that duty, and damage proximately resulting from the undischarged duty. *Anderson v. Nashua Corp.*, 519 N.W.2d 275 (Neb. 1994). The question of whether a legal

Page 5

duty exists for actionable negligence is a question of law dependent on the facts in a particular situation. *Id.*

Evaluating the foregoing factors according to their relative importance with respect to this threshold issue, *i.e.*, whether Baran owed Hull a duty of care, Nebraska clearly has the most significant relationship to the occurrence and the parties. Of the four factors, the first factor (place where the injury occurred) is the most important. Ray Hull fell 240 feet from the top of a cell phone tower at an industrial project job site in Fremont, Nebraska. Nebraska clearly has a greater interest in regulating industrial safety and redress for those injured in Nebraska than does Oklahoma.

Analysis of the second factor (place where the conduct causing the injury occurred) also leads to the conclusion that Nebraska, not Oklahoma, has the most significant relationship to the occurrence and the parties. The conduct that caused the injury consisted of a continuous, systematic, and unreasonable course of behavior that reflected callous disregard for the safety of anyone on the job site, in particular Ray Hull. This behavior by Baran Telecom, in particular Dee Farquhar, included repeated angry outbursts in response to anything that threatened to impede completion of the tower by midnight on November 27, 2003. Mr. Farquhar made repeated telephone calls to Mr. Hull to find out how close he was to the job site while Mr. Hull made a sleepless two-day, cross-country odyssey to retrieve a gin pole and hoist so that the tower could be completed by Baran's deadline. All of this behavior was focused upon the epicenter of the parties' relationship: the tower site in Fremont, Nebraska. None of the conduct took place in Oklahoma.

The third factor (domicile of parties) points neither to Oklahoma nor Nebraska as the state having the most significant relationship to the occurrence and the parties. Innovative Wireless Construction was a corporation organized under the laws of the State of Oklahoma. Defendant

Nextel Partners Operating Corp. is a corporation incorporated under the laws of the State of Delaware and having its principal place of business in a state other than Oklahoma. Defendant Wireless Solutions, LLC is a limited liability company having its principal place of business in a state other than Oklahoma. Defendant Baran Telecom, Inc. is a corporation incorporated under the laws of the State of Georgia and having its principal place of business in a state other than Oklahoma.

The fourth factor (place where the relationship between the parties occurred) also points to Nebraska as the state having the most significant relationship to the occurrence and the parties. The relationship began when Baran contacted IWC and requested that it travel immediately to the tower site in Fremont, Nebraska to take over a stalled project. The parties' entire relationship was sharply focused on the tower site in Nebraska.

Baran, in its briefing, correctly states (albeit in reverse order) the factors laid out in *Brickner v. Gooden*, 525 P.2d 632, 637 (Okla. 1974). Those factors are (in the order in which they are stated in *Brickner*):

(1) The place where the injury occurred,
(2) The place where the conduct causing the injury occurred,
(3) The domicile, residence, nationality, place of incorporation and place of business of the parties, and
(4) The place where the relationship, if any, between the parties occurred.

These factors are taken from the Restatement (Second) Conflicts of Laws, § 145 (1968). As stated by the Oklahoma Supreme Court in *Beard v. Viene*, § 145 is an effectuating provision designed to attain the underlying choice of law principles stated in § 6 of the Restatement. 826 P.2d 990, 995 (Okla. 1992). Section 6 provides that when there is no statutory directive in the forum state on the choice of law, the factors relevant to the choice of the applicable rule of law include, among others,

(1) the relevant policies of the forum, and (2) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue. Restatement (Second) Conflicts of Laws, § 6 (1968). Nebraska clearly has a greater interest than any other state in the regulation of the safety of job sites within its territorial boundaries. It would be absurd if the safety rules of a job site and the duties owed by the general contractor to employees of its subcontractors on the job site were regulated by different jurisdictions simply because the domicile of the workers and employees differed. Imagine a hypothetical tower site a half of a mile from the site at which Hull was injured, identical in all respects except that the domicile of the general contractor and the subcontractor's employees were different than the parties in this case. Clearly, the duties owed by the general contractor to the employees of its subcontractor should be the same on both sites. Nebraska has the greatest interest in uniformly regulating the safety of job sites within its territorial boundaries, and its substantive law should apply in this case.

Baran argues that the case of *Brickner v. Gooden* should determine the rights of the parties in this case, but the facts of *Brickner* are plainly distinguishable. 525 P.2d 632. Baran argues that the Court in *Brickner* determined that Oklahoma had the most significant relationship "because the parties resided in Oklahoma and the trip originated and ended in Oklahoma". While this is partially true, it is just that, *partially* true. The Court in *Brickner* determined that Oklahoma had the most significant relationship to the occurrence and the parties because (1) **_all_** of the parties resided in Oklahoma, (2) the aircraft that was involved in the accident was registered and hangared in Oklahoma, and (3) the trip originated and was to end in Oklahoma. Thus, every significant fact about the parties and the accident centered on Oklahoma, except that the brief excursion trip was outside the boundaries of Oklahoma.

In the instant case, Hull and his employer were domiciled in Oklahoma. Baran is incorporated under the laws of the State of Georgia and has its principal place of business in a state other than Oklahoma. Baran argues an Oklahoma connection from the fact that Plaintiff brought his hand tools from Oklahoma, an argument that ignores the situs of the most important tool involved in this case: the crane that Baran promised to Plaintiff at the job site in Nebraska. Upon its untimely departure, Baran substituted the gin pole and defective cable that Plaintiff used and which failed on the job site in Fremont, Nebraska. When Hull accepted the contract, he immediately traveled to Nebraska and began working on the project. He left Nebraska on his sleepless two (2) day trip to retrieve a gin pole from Texas, returning to Nebraska. Baran, through Mr. Farquhar, repeatedly called him while Hull was en route and on site at the tower in Nebraska. The substance of every call was the question: "When will you be on site in Fremont?" Hull, moreover, dealt systematically with Baran through its on-site liaison and supervisor, Scott Rogers, at the job site in Fremont, Nebraska.

The instant case is hardly one in which all of the parties and instrumentalities originated from within Oklahoma, only leaving its boundaries temporarily to return to Oklahoma. The parties are of diverse citizenship and all of the instrumentalities and activities either occurred within Nebraska's boundaries or were directed at the industrial job site in Fremont, Nebraska. Nebraska has the most significant relationship to the occurrence and the parties and Nebraska law should apply.

**B.**

**Under Nebraska Law, Baran Had A Duty To Provide Ray Hull With A Safe Workplace**

Under Nebraska law, a general contractor owes a duty to the employees of a subcontractor to provide a reasonably safe place to work. *Parrish v. Omaha Public Power District,* 496 N.W.2d

Page 9

902 (Neb. 1993); *Whalen v. U.S. West Communications, Inc.*, 570 N.W.2d 531 (Neb. 1997); *Dellinger v. Omaha Public Power District,* 611 N.W.2d 132 (Neb. 2000); *Sullivan v. Geo. A. Hormel and Co.*, 303 N.W.2d 476 (Neb. 1981).

"A general contractor, in control of the premises where work performance under a contract with the owner is being carried out, owes a duty to persons rightfully on the premises to keep the premises in a reasonably safe condition while the contract is in the course of performance." *Id.*, at 478. As a result, general contractors owe a duty of care to their subcontractors and the subcontractors' employees to provide a reasonably safe workplace, even though they do not own the premises. *Parrish,* 496 N.W.2d 902 ; *Whalen,* 570 N.W.2d 531; *Dellinger,* 611 N.W.2d 132; *Sullivan*, 303 N.W.2d 476.

For an employee of a subcontractor to hold the general contractor responsible for a breach of this duty, both of the following requirements must be satisfied: 1) The *Parrish* Test; and, 2) The accident must have occurred during the course of performance of the contract between the subcontractor and the contractor.

(a)

### The *Parrish* Test

In *Parrish*, the Nebraska Supreme Court developed a test, based upon doctrine found in the Restatement (Second) of Torts §414, to determine whether the "safe workplace" doctrine is applicable. According to the Court, the general contractor must have:

(1)   supervised the work that caused the injury to the employee;

(2)   had actual or constructive knowledge of the danger which ultimately caused the injury; and,

  (3)  had the opportunity to prevent the injury, but negligently failed to prevent the injury. *Parrish,* 496 N.W.2d at 911.

In *Thorne v. Omaha Public Power District*, 1997 WL 249434 (Neb. App. 1997), the Court found active supervision when the general contractor employed a full-time, on-site supervisor who was able to monitor the subcontractor's work. In *Parrish*, the court found active supervision when, in addition to having actual control of the construction site, the general contractor had contractual authority to order safety measures for the subcontractor's work and take steps to correct any non-compliance by the subcontractor in its subcontract with the general contractor. *Parrish,* 496 N.W.2d 902.

  **(1)**  <u>**Baran Supervised the Work that Caused the Injury**</u>

Like the general contractor in *Thorne*, Baran maintained a full-time, on-site supervisor, Scott Rogers, who was able to monitor IWC's work. Mr. Rogers was IWC's on-site liaison of the job. Mr. Hull dealt with the employees of Skyline Tower through the on-site liaison, Scott Rogers. Dee Farquhar told Mr. Hull that he would be reporting to Scott Rogers as Baran's on-site representative. Mr. Rogers was on site on a daily and full-time basis.

Like the general contractor in *Parrish*, Baran retained substantial contractual authority over IWC. Specifically, the subcontract agreement between Baran Telecom and IWC provides that IWC will, (i): keep Baran fully informed regarding IWC's delivery schedule, (ii) take whatever steps Baran deems necessary to improve the rate of progress on the job, (iii) maintain, on the job site, someone with authority to carry out directions from Baran relating to IWC's work. *See Contract attached to Baran's Motion for Summary Judgment as Exhibit "B", ¶¶ 4(a), 5(a), and 7(e).* Baran may also require IWC to work on various parts of the job that Baran directs in preference to other

Page 11

parts of the job; also, IWC shall, if requested by Baran, furnish time sheets and various other reports to Baran each day. *See Contract attached to Baran's Motion for Summary Judgment as Exhibit "B", ¶¶ 7(e) and 9(d)*. Baran clearly supervised the work that caused the injury to Ray Hull.

### (2)     Baran Had Actual Knowledge of the Danger That Caused the Injury.

Baran is in the business of telecommunications (and hence tower) turnkey construction. Baran was thus well aware of the relevant elements of tower construction, i.e. that: whether a crane or gin pole and hoist are used, as the tower is erected, the workers or "tower hands" must climb up a tower of this nature, and maneuver the tower components into place and bolt them to the top of the tower.  The crew's work becomes more complex (and dangerous), however, when it stacks the tower with a gin pole and hoist.  As noted previously, the crew attaches the gin pole to the partially-erected structure of the tower itself, and raises it each time a new tower section is completed, using the hoist and a complex pulley system.  The gin pole used on this tower weighed nearly a ton.  The gin pole serves the same function as a crane, i.e. raising the pieces of the tower from the ground to the top of the partially-erected tower, via a cable threaded through the end of the gin pole and connected the hoist on the ground.

### (3)     Baran Had the Opportunity to Prevent the Injury and Failed to Do So.

Obviously, tower erection in general, and tower erection using a gin pole and hoist in particular, presents serious hazards, even with a well-rested crew.  In the present case, however, due to Dee Farquhar's continuous, shrill insistence on project completion (crane or no crane, regardless of consequences) by midnight, November 27th, Ray Hull and Ronnie Ketchens were deprived of any meaningful sleep for days.  Because Baran was aware of the obvious dangers created by a hurried

approach to such a dangerous task, it clearly had the ability to prevent the injury, its failure to do so was grossly negligent, and the *Parrish* Test is satisfied.

**(b)**

**The Accident Occurred During The
Course Of Performance Of The Contract
Between The Subcontractor And The Contractor**

In order for an employee of a subcontractor to impose liability on the general contractor for breaching its non-delegable duty to provide a safe workplace, the employee must also have sustained his or her injury while performing services that the subcontractor agreed to provide for the general contractor. *McKinstry v. County of Cass*, 424 N.W.2d 422 (Neb. 1988), *Sullivan*, 303 N.W.2d 476, and *Hand v. Rorick Construction Co.*, 206 N.W.2d 835 (Neb. 1971). IWC agreed to erect this 350-foot, self-supporting tower pursuant to Baran's terms and conditions, and during the course of performance, Mr. Hull was injured.

**C.**

**Baran Owed Ray Hull A Duty Of
Care As A Supplier Of A Chattel In
Connection With Its Gin Pole And Hoist**

After the crane operator dismantled the crane and left the job site, Baran furnished Plaintiff Ray Hull a gin pole, hoist, and rigging equipment so he would complete the tower by Baran's self-imposed, or internal deadline of midnight, November 27, 2003. Consequently, Baran owed Ray Hull a duty of care in connection with these chattels.

In *Semlar v. Sears, Roebuck & Co.*, 689 N.W.2d 327, 334 (Neb. 2004), the Supreme Court of Nebraska cited the Restatement (Second) of Torts § 392 (1965) to determine whether the supplier of a chattel owes a duty to whom the chattel is supplied:

Page 13

> One who supplies to another, directly or through a third person, a chattel to be used for the supplier's business purposes is subject to liability to those for whose use the chattel is supplied, or to those whom he should expect to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by persons for whose use the chattel is supplied (a) if the supplier fails to exercise reasonable care to make the chattel safe for the use for which it is supplied, or (b) if he fails to exercise reasonable care to discover its dangerous condition or character, and to inform those whom he should expect to use it.

The court also referred to Comment e of the Restatement (Second) of Torts § 392 for a definition of business purpose.

> One who employs another to erect a structure or to do other work, and agrees for that purpose to supply the necessary tools and temporary structures, supplies them to the employees of such other for a business purpose. This is true irrespective of whether the structure or work when finished is to be used for business or residential and social purposes. On the other hand, if it is understood that the person who is to do the work is to supply his own instrumentalities, but the person for whom the work is to be done permits his own tools or appliances to be used as a favor to the person doing the work, the tools and appliances are supplied as a gratuity and not for use for the supplier's business purposes.

In the present case, Hull was injured while using Baran's gin pole and hoist. Baran provided this gin pole and hoist to Plaintiff for its business purpose of ensuring that the tower was completed by its internal, administrative deadline of midnight November 27, 2003. Plaintiff originally accepted, on behalf of his employer, IWC, Baran's offer to immediately take over and complete a stalled project, erecting pre-assembled sections of a 350-foot self-supporting tower using a large crane, to be supplied by Baran. When the crane operator dismantled his machine and left the job site, Mr. Farquhar still demanded the tower be completed by midnight, November 27, 2003,

Page 14

regardless of how it was done. Plaintiff, as described above, finally had no option but to use Baran's gin pole and hoist to complete the tower by Baran's deadline.

While Plaintiff was using the gin pole and hoist for the purpose for which Baran supplied them, one of the hoist cables broke, *UNDER A LOAD EQUAL TO LESS THAN 15% OF ITS RATED BREAKING STRENGTH* resulting in Plaintiff's fall. Baran breached its duty to Plaintiff to exercise reasonable care to discover the cable's dangerous condition and to warn Ray Hull and anyone else that was expected to use it.

## VII.

## Conclusion

WHEREFORE, Plaintiffs respectfully submit the foregoing authorities as their Trial Brief herein.

Dated this 6th day of January, 2006.

                                              Respectfully submitted,

                                              LOGAN & LOWRY, LLP
                                              101 South Wilson Street
                                              P. O. Box 558
                                              Vinita, OK 74301-0558
                                              (918) 256-7511

                                              Attorneys for Plaintiffs
                                              Ray Hull and Karen K. Hull


                                    By:    /s/ J. Stephen Neas
                                                    Thomas J. McGeady, O.B.A. #5984
                                                    Ryan P. Langston, O.B.A. #20517
                                                    J. Stephen Neas, O.B.A. #19896

## CERTIFICATE OF MAILING

 I, J. Stephen Neas, do hereby certify that on this 6th day of January, 2006, I mailed a true and correct copy of the above and foregoing "Plaintiff's Trial Brief" to:

Robert W. Nelson, Esquire
Thomas A. Paruolo, Esquire
WHITTEN, NELSON, MCGUIRE,
 TERRY & ROSELIUS
Suite 400, One Leadership Square
211 N. Robinson
Oklahoma City, OK 73102
(Attorneys for Defendant, Baran Telecom, Inc.)

with proper postage thereon fully prepaid.

                /s/ J. Stephen Neas
                J. Stephen Neas